OPINION
Defendant-appellant/cross-appellee, Kenneth J. Golick ("Kenneth"), appeals a Clermont County Court of Common Pleas, Domestic Relations Division, property division in a divorce action with plaintiff-appellee/cross-appellant, Carleen D. Golick ("Carleen").[1]
The parties were married in October 1982 and have two daughters (born in 1983 and 1986). Carleen is a licensed cosmetologist. While for most of the parties' marriage, she was a homemaker, she occasionally worked as a secretary for K. J. Golick Co., Inc. ("K. J. Golick Co."), a company Kenneth started in 1984. Kenneth is a self-employed manufacturer's representative selling equipment for water plants. Although the company was successful for several years, it experienced several cash flow problems in the 1990s. As a result, Kenneth loaned money to his company ($10,000 in 1993 and 1997, $15,000 in 1994, and $35,000 in 1995). Kenneth testified that in lieu of receiving wages from the company, he was "taking repayment of loan instead." In 1998, the company lost its principal manufacturer when BIF terminated its sales representation agreement with K. J. Golick Co.
In February 1997, Kenneth's mother, Jennie Golick, and his aunt, Mary Pozelnick, came to live with the parties. Until her death in September 1997, Kenneth's mother contributed her income to the household expenses. Kenneth's aunt, who is disabled and legally blind, also contributes her income to the household expenses. Kenneth has access to, and control over, his aunt's bank account. Kenneth started managing the financial affairs of his mother and aunt in 1988. During the parties' marriage, Kenneth was in charge of managing the parties' bank accounts and the company's business account.
In 1990, the parties purchased a vacation house in Lafollette, Tennessee (the "Tennessee property"), for $89,000 with a down payment of $23,000. That same year, the parties also purchased an office building on Ohio Pike, in Amelia, Ohio (the "Ohio Pike property") for $100,000 with a down payment of $26,422.80. The office building was used for Kenneth's company. Until the Ohio Pike property sold sometime between August 1998 and January 1999, K. J. Golick Co. was paying Kenneth $1,500 a month in rent. In 1991, the parties purchased their current marital residence on Trevino Court in Cincinnati (the "Trevino property") for $230,000 with a down payment of $130,714.59. All three properties are in both parties' names.
Carleen filed a divorce complaint in the trial court in June 1997. By order filed August 31, 1998, the magistrate granted exclusive occupancy of the marital residence to Carleen during the divorce proceedings, and ordered Kenneth, "[u]pon vacating the marital residence, * * * [to] continue to pay all of the expenses, * * * and in addition [to] pay to [Carleen] the sum of $400.00 per month to pay for groceries and other incidental household expenses." Despite the magistrate's order, the parties continued to reside in the marital residence until Carleen moved out of the residence in January 1999.
A hearing was held before the trial court in October 1998. During the hearing, Kenneth claimed that monies used for down payments on the parties' three properties were gifted to him alone, by either his mother or his aunt. As a result, Kenneth claimed that the down payments should be awarded to him as his separate property. Carleen claimed that the monies used for the down payments were instead loaned by Kenneth's mother and/or his aunt to both parties during their marriage. As a result, Carleen claimed that the down payments were marital property.
By decision filed March 4, 1999, the trial court found that Kenneth received a cash gift of $46,000 from his mother in May 1990 and that as a result, $46,000 of the Trevino property down payment came from Kenneth's separate property. With regard to the Ohio Pike property, the trial court found that Kenneth received a gift of $20,000 from his aunt in September 1990 and that as a result, $20,000 of the Ohio Pike property down payment came from Kenneth's separate property. The trial court found that any appreciation in the value of either the Trevino property or the Ohio Pike property "was due to the parties' efforts in maintaining and caring for the [properties]." As a result, "any increased value in [both properties] [was] marital property." With regard to the Tennessee property, the trial court found that the entire down payment for the property "was given as a gift to both parties" by Kenneth's aunt and that as a result, the $23,000 down payment was marital property. The trial court ordered that the Trevino and Tennessee properties be sold. The trial court also ordered Kenneth to pay both properties' mortgage, insurance, and taxes pending sale.
With regard to K. J. Golick Co., the trial court found that the fair market value of the business, upon liquidation, was $10,000, and ordered Kenneth to pay Carleen $5,000, "her one half interest in the company[.]" The trial court also ordered Kenneth to pay Carleen a lump sum of $15,000 for spousal support, and $5,000 in attorney fees. The parties were divorced by divorce decree filed April 13, 1999.
Both parties appealed the divorce decree in May 1999.[2] In September 1999, Kenneth filed a Civ.R. 60(B) motion, asking the trial court to,inter alia, set aside "the judgment in the Decree of Divorce ordering [him] to be solely responsible for all expenses to maintain and service the debts for the Tennessee * * * property." In November 1999, Carleen, in turn, filed a Civ.R. 60(B) motion. An agreed entry filed November 8, 1999 provided that
 The parties are in agreement on all issues set forth below.
* * *
 1. Both parties' Motions for Relief Pursuant to Rule 60(B) are granted. The issues to be presented to the Court, for the purpose of amending the Decree of Divorce journalized on April 13, 1999, are as follows: (1) whether the Court should retain jurisdiction over the proceeds from the sale of the [Trevino property] and the [Tennessee property]; (2) whether [Kenneth] should receive a credit for the sum of $120,000.00 paid to [Carleen], as set forth in the Agreed Entry journalized January 22, 1999; (3) whether the [Tennessee property] should be listed for sale as "furnished" or "unfurnished;" (4) whether [Carleen] is to return the items she removed from the [Tennessee property] during the pendency of the divorce proceeding; (5) whether [Kenneth] should have the option of "buying out" [Carleen's] interest in the [Trevino property]; and (6) the terms of sale for listing and selling the [Trevino property] and the [Tennessee property].
Because the parties had filed Civ.R. 60(B) motions while this case was on appeal, this court, by entry filed February 28, 2000, remanded the case to the trial court "for the purpose of ruling on Civ.R. 60(B) motions to be filed by the parties." By decision filed March 6, 2000, the magistrate found, inter alia, that
Credit for Sums Advanced
 [Kenneth] requests that he receive a credit in the amount of $120,000.00 for monies advanced to [Carleen] during the pendency of the divorce. [Carleen] agrees that [Kenneth] is entitled to a property division credit in the sum of $120,000.00 for monies advanced to [Carleen]. Therefore, [Kenneth] shall receive a credit in the amount of $120,000.00 in the property division.
 Real Estate-900 Trevino Court
* * *
 Three real estate agents testified regarding the value of the home. * * * Based upon the testimony presented, the Court finds the real estate located at 900 Trevino has a value of $275,000.00
 [Kenneth] may buy out [Carleen's] interest in the Trevino [property] by paying [Carleen] one-half of the equity of the real estate. The value of $275,000.00, reduced by the balance of the mortgage owed as of February 1, 1999 ([Carleen] moved out of the residence in January 1999), reduced by $46,000.00 for [Kenneth's] separate property, reduced by $120,000.00 for the credit to which [Kenneth] is entitled for sums advanced, results in the equity of the marital residence. * * * If [Kenneth] does not pay [Carleen] one-half the equity within 60 days from the date of this Decision, then the real estate shall be sold. * * *
 Real Estate-Lafollette, Tennessee
* * *
 [Kenneth] requests that he be reimbursed from the net proceeds for the payment he made for the mortgage, taxes, and insurance until the real estate is sold. [Carleen] argues that the allocation of expenses for the Lafollette property was not one of the issues identified in the Agreed Entry journalized November 8, 1999, as an issue to be litigated and, therefore, the Court does not have authority to rule on this issue. [Carleen's] argument is not well taken. [Kenneth's] Motion * * * specifically identifies the allocation of expenses for the Lafollette property as part of the 60(B) motion.
 * * * Therefore, in order for the proceeds from Lafollette to be divided equally, [Kenneth] should be reimbursed for the expenses he pays, less any rental income received, until the Lafollette real estate is sold.
* * *
Recommendations
* * *
 3. * * * At the closing on the sale of the [Trevino property], and following payment of all expenses incident to sale, including but not limited to, the first mortgage * * *, real estate taxes, prorations, liens, real estate commissions, and other approved expenses incident to sale, [Kenneth] shall first receive from the net proceeds $166,000.00 [$120,000 + $46,000]. The remaining net proceeds, if any, shall be divided equally.
* * *
 5. * * * At the closing on the sale of the [Tennessee] real estate, and following payment of all expenses incident to sale, including but not limited to, the first mortgage, real estate taxes, prorations, liens, real estate commissions, * * * [Kenneth] shall first receive from the net proceeds any remaining balance from the credit of $166,000.00 for which he was not compensated from the equity in the Trevino * * * real estate. [Kenneth] shall then be reimbursed for the amount by which he reduced the mortgage principal balance beginning February 1, 1999, and for the real estate taxes and insurance paid from February 1, 1999, less any rent he received. The remaining net proceeds shall be divided equally.
Carleen filed objections to the magistrate's decision. In particular, she objected to the magistrate's decision requiring her to share equally in the Tennessee property expenses. By decision and entry filed May 8, 2000, the trial court sustained that objection as follows:
 Pursuant to the Decree of Divorce * * *, it was ordered that [Kenneth] was to be solely responsible for "the mortgage, insurance and taxes." [Kenneth] requested relief from this order [by a Civ.R. 60(B) motion]. An agreed entry was journalized on November 8, 1999. Pursuant to the entry, "[b]oth parties' Motions for Relief pursuant to Rule 60(B) are granted." * * * It appears * * * that the parties merely intended for the Court to address limited issues. The entry states which issues are to be heard by the Court for purposes of amending the decree of divorce. The issue of the expenses related to the Tennessee property is not included in the entry. Assuming, however, that the Court did have jurisdiction to address the issues of the Tennessee property expenses, the question is whether [Kenneth] is entitled to relief pursuant to Civ.R. 60(B). * * * Upon review of the evidence presented, the Court finds that [Kenneth] has failed to establish that he is entitled to relief under one of the grounds stated in Civ.R. 60(B)(1)-(5).
In April 2001, the parties filed a joint motion to remand the case to the trial court for the purpose of establishing jurisdiction with the trial court to journalize several decisions. The case was remanded and by entry filed April 18, 2001, the parties' November 8, 1999 agreed entry, the magistrate's March 6, 2000 decision, and the trial court's May 8, 2000 decision and entry were all re-journalized effective April 18, 2001. This appeal follows.
On appeal, Kenneth raises five assignments of error. On cross-appeal, Carleen raises five assignments of error. Kenneth's first assignment of error and Carleen's first cross-assignment of error both deal with the same issue, and therefore will be discussed together. Kenneth's fourth assignment of error and Carleen's fifth cross-assignment of error will be similarly discussed together. Each of the other assigned errors will be discussed separately.
In his first assignment of error, Kenneth argues that the trial court erred by failing to award him "the full extent of his nonmarital gifts used as down payments for real estate purchased during the marriage." Kenneth asserts that most of the monies used for the down payments on the parties' three properties were gifted to him alone, by either his mother or his aunt, and that as a result, those monies should be awarded to him as his separate property. In her first cross-assignment of error, Carleen argues that the trial court erred by not finding that "all down payment funds were marital property."
In a divorce proceeding, the trial court must first determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B). Once the trial court has determined the status of the parties' property, the court must generally disburse a spouse's separate property to that spouse and equitably distribute the marital property. R.C. 3105.171(B) and (D). We review the classification of property as marital or separate under a manifest weight of the evidence standard.Johnson v. Johnson (Sept. 27, 1999), Warren App. No. CA99-01-001, unreported, at 7. Under such standard, the trial court's factual findings regarding the classification of property as marital or separate "are reviewed to determine whether they are supported by competent, credible evidence." Id. The trial court's property award, in turn, will not be reversed absent an abuse of discretion. Barkley v. Barkley (1997),119 Ohio App.3d 155, 159.
"Marital property" is defined in R.C. 3105.171(A)(3)(a)(i) and (ii) to include "[a]ll real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both of the spouses during the marriage[,]" and "[a]ll interest that either or both of the spouses currently has in any real or personal property * * * and that was acquired by either or both of the spouses during the marriage[.]" Marital property does not include any separate property. R.C. 3105.171(A)(3)(b). "Separate property" in turn is defined in R.C. 3105.171(A)(6)(a)(vii) to include "[a]ny gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse." "Clear and convincing evidence" means that degree of proof that will provide in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. Barkley, 119 Ohio App.3d at 168-169.
The commingling of separate and marital property does not destroy the character of separate property unless its identity as separate property is not traceable. R.C. 3105.171(A)(6)(b). The party seeking to have a particular asset classified as separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property. Peck v. Peck (1994), 96 Ohio App.3d 731, 734.
In the case at bar, it is undisputed that all three properties were purchased by the parties during the marriage, and that they are held in both parties' names. For purposes of clarity, we will consider each property separately.
1. The Trevino Property (aka the marital residence)
The Trevino property was purchased in February 1991 for $230,000 with a down payment of $130,714.59. The trial court found that Kenneth received a cash gift of $46,000 from his mother in May 1990 and that as a result, only $46,000 of the Trevino property down payment was his separate property. On appeal, Kenneth argues that had the trial court properly considered the totality of the exhibits before it, the court would have found that $105,000 of the down payment was traceable to his separate property. Carleen essentially contends that because all monies used for the down payment were previously deposited in the parties' joint bank account, the Trevino property down payment is marital property.
We note at the outset that Kenneth consistently testified that any money given by either his mother or his aunt during the parties' marriage was given to him only, and that it was never paid back. Kenneth denied borrowing money from his aunt or mother during the parties' marriage. Kenneth testified that any transfers of money from his mother's and aunt's accounts to him were at their discretion. Kenneth also testified that because he managed the financial affairs of his mother and aunt, he was frequently asked by them to withdraw money from their accounts. Kenneth admitted, however, that those requests were only oral. Carleen, in turn, consistently testified that any monies received from Kenneth's mother or aunt during the parties' marriage were loans. Because Carleen was not privy of many of the transfers of money between the parties' accounts and Kenneth's mother's and aunt's accounts, her testimony was peppered with "I don't know" statements and her belief that everything received during the parties' marriage was marital property.
Kenneth argues that $105,000 of the Trevino property down payment was traceable to his separate property as follows: (1) a $46,000 cash gift from his mother in May 1990, and subsequently deposited in the parties' joint account, (2) a $7,000 withdrawal from his aunt's Discover Savers' account on February 7, 1991, (3) a $10,000 withdrawal from his mother's Ohio Savings Bank account on January 19, 1990, and subsequently deposited in the parties' joint account, (4) a $10,000 withdrawal from his aunt's Ohio Savings Bank account on October 10, 1989, and subsequently deposited in the parties' joint account, and (5) $32,000 from cashing a $40,000 money market certificate given to him by his aunt, and subsequently deposited in the parties' joint account.
After thoroughly reviewing the totality of Kenneth's exhibits and the parties' testimony, we agree with the trial court that only $46,000 of the Trevino property down payment is traceable to Kenneth's separate property. Kenneth's exhibit 13, a gift tax return, clearly shows that in May 1990, his mother gave him $46,000. The gift tax return lists Kenneth as the sole recipient of the money. As a result, the $46,000 was Kenneth's separate property, R.C. 3105.171(A)(6)(a)(vii), which he used to pay part of the Trevino property down payment, and which was properly awarded to him as his separate property.
Carleen argues that because the $46,000 had been deposited in the parties' joint account, it was marital property. However, as already noted, the commingling of separate and marital property does not destroy the character of the separate property as long as its identity as separate property is traceable. R.C. 3105.171(A)(6)(b). The $46,000 used for the down payment was clearly traceable to Kenneth's mother's cash gift and therefore had retained its identity as separate property.
Carleen also succinctly argues that Kenneth transferred a present possessory interest in his $46,000 separate property to her as evidenced by his titling the real estate jointly, treating the funds as jointly owned with her, and depositing the funds into joint accounts. "Spouses can change separate property to marital property based on actions during the marriage." Moore v. Moore (1992), 83 Ohio App.3d 75, 77. The most commonly recognized method for effecting this change is through an intervivos gift of the property from the donor spouse to the donee spouse. The essential elements of an inter vivos gift are (1) intent of the donor to make an immediate gift, (2) delivery of the property to the donee, and (3) acceptance of the gift by the donee. Bolles v. Toledo Trust Co. (1936), 132 Ohio St. 21, paragraph one of the syllabus.
Because the holding of title to property by both spouses does not, by itself, determine whether the property is marital or separate, R.C.3105.171(H), our inquiry focuses on whether Kenneth had the requisite donative intent to transfer a present possessory interest in his separate property to Carleen. It is well-established that the donor is not required to introduce evidence that he did not intend for his separate property to be commingled into marital property. See Yeary v. Yeary (May 22, 2000), Brown App. No. CA99-07-023, unreported. Rather, the donee has the burden of showing by clear and convincing evidence that the donor intended an inter vivos gift. In re Fife's Estate (1956),164 Ohio St. 449, 456. We find that Carleen has failed to meet her burden of proof. Carleen's foregoing argument meets neither the required burden of proof nor the essential elements of an inter vivos gift.
With regard to the other alleged gifts of money from his mother and aunt (totaling $59,000), we find that Kenneth has failed to prove by clear and convincing evidence that those gifts were gifts to him only. In seeking to establish that the $59,000 was given to him only, Kenneth introduced evidence in the form of his own testimony, bank statements from the parties' joint account, bank statements from his mother's and aunt's accounts, and check registrars. While those documents show that money was withdrawn several times from his mother's and aunt's accounts and subsequently deposited in the parties' joint account, they do not show that the money was intended as a gift to him alone. The only evidence Kenneth introduced to show that the $59,000 from his mother and aunt had been intended as gifts to him alone was his own testimony. Given the lack of evidence introduced by Kenneth to trace the $59,000 to him as his separate property, we find that the trial court properly awarded to him as his separate property only $46,000 of the Trevino property $130,714.59 down payment. See Herrmann v. Herrmann (Nov. 6, 2000), Butler App. No. CA99-01-011, unreported.
2. The Ohio Pike Property
The Ohio Pike property was purchased in September 1990 for $100,000 with a down payment of $26,422.80. The property, an office building, was used for Kenneth's company. The trial court found that Kenneth's aunt made a gift to him alone of $20,000 for the purchase of the Ohio Pike property and that as a result, only $20,000 of the Ohio Pike property down payment was his separate property.
On appeal, Kenneth argues that $25,000 of the down payment is traceable to his separate property as follows: (1) a $20,000 check from his mother's Ohio Savings Bank account from September 1990 made out to him only, and subsequently deposited in the parties' joint account, (2) a $5,000 withdrawal from his mother's Ohio Savings Bank account on September 18, 1990, and (3) a $4,270.42 withdrawal from his aunt's Ohio Savings Bank account on September 26, 1990. Kenneth explained that the difference between the down payment and the foregoing three numbers was used to pay other expenses associated with the purchase of the property. Kenneth also introduced evidence of a $5,000 withdrawal in September 1990 from a Discover Savers account held jointly by Kenneth, his aunt, and Carleen.
We note at the outset that the trial court mistakenly found that Kenneth received a $20,000 gift from his aunt rather than from his mother. Exhibits submitted by Kenneth clearly show that a money market certificate owned by his mother at the Ohio Savings Association was closed on September 13, 1990, and that the proceeds of the certificate were given to Kenneth in the form of a $20,000 check from Ohio Savings Bank. The $20,000 check is made out solely to Kenneth. As a result, the $20,000 was Kenneth's separate property, R.C. 3105.171(A)(6)(a)(vii), which he used to pay part of the Ohio Pike property's down payment, and which was properly awarded to him as his separate property.
With regard to the $20,000, Carleen reiterates the same two arguments she asserted regarding the $46,000 of the Trevino property down payment. For purposes of brevity, we incorporate our treatment of Carleen's arguments regarding the Trevino property here, and find that the $20,000 used for the Ohio Pike property down payment was clearly traceable to Kenneth's mother's certificate and therefore had retained its identity as separate property. We further find that Carleen has failed to prove that Kenneth intended an inter vivos gift to her of the $20,000.
With regard to the other alleged gifts of money from his mother and aunt (totaling $9,270.42), we find that Kenneth has failed to prove by clear and convincing evidence that those gifts were gifts to him only. While the exhibits submitted by Kenneth show that $5,000 was withdrawn from his mother's account and $4,270.42 was withdrawn from his aunt's account, they do not show that both withdrawals were intended as gifts to him alone. Again, the only evidence introduced to show that both withdrawals from his mother and aunt had been intended as gifts to him alone was his own testimony. Given the lack of evidence introduced by Kenneth to trace both withdrawals to him as his separate property, we find that the trial court properly awarded to him as his separate property only $20,000 of the Ohio Pike property $26,422.80 down payment.
3. The Tennessee Property
The Tennessee property was purchased in April 1990 for $89,000 with a down payment of $23,000. The trial court found that
 [Kenneth's] Exhibit 26A clearly shows that $23,000 was withdrawn from an account held by Aunt Mary, and deposited into an account held jointly by the parties. This money was used as a down payment on the home, deeded in both parties' names. In [Carleen's] Exhibit 6, a letter to the lending institution, [Kenneth] references "our down payment," referring to [Carleen] and himself. The vacation home was used for the benefit and enjoyment of the entire family. The Court finds that [Kenneth] presented insufficient evidence which would establish that the $23,000 received from Aunt Mary was intended as a gift to [Kenneth] solely. Rather, the Court finds that the money was given as a gift to both parties of the marriage.
On appeal, Kenneth asserts with much force that the $23,000 used for the Tennessee property down payment was given by his aunt to him only and that therefore, it is his separate property. We disagree. Kenneth's exhibits 26A and 28 (and not exhibit 23 as stated in his brief) show nothing more than $23,000 was withdrawn from his aunt's account and subsequently deposited in the parties' joint account. The exhibits do not show that the $23,000 was intended as a gift to him alone. Again, the only evidence offered by Kenneth that the $23,000 from his aunt had been intended as a gift to him alone was his own testimony. Given the lack of evidence introduced by Kenneth to trace the $23,000 to him as his separate property, we find that the trial court properly found that the $23,000 was marital property.
In light of all of the foregoing, we find the evidence submitted by both parties clearly establishes that $46,000 of the Trevino property down payment and $20,000 of the Ohio Pike property down payment are Kenneth's separate property. We further find that the trial court did not err in awarding both amounts to Kenneth as his separate property, and in awarding the balance of the down payments of the parties' three properties to the parties as marital property. Kenneth's first assignment of error and Carleen's first cross-assignment of error are overruled.
In his second assignment of error, Kenneth argues that the trial court erred by "failing to award [him] the passive appreciation of his non-marital gifts as separate property." Specifically, Kenneth asserts that the appreciation in value of the Trevino, Ohio Pike, and Tennessee properties was passive, and that therefore, the trial court erred by failing to award him the passive appreciation attributable towards his contribution of separate property, which was used for the down payments of the properties. In light of our foregoing ruling that the Tennessee property down payment was entirely marital property, we will address Kenneth's argument under this assignment of error only with regard to the Trevino and Ohio Pike properties. The trial court found that any appreciation in the value of both properties was marital property.
"Marital property" includes "all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage[.]" R.C.3105.171(A)(3)(a)(iii). "Separate property" in turn includes "[p]assive income and appreciation acquired from separate property by one spouse during the marriage[.]" R.C. 3105.171(A)(6)(a)(iii). Passive income is "income acquired other than as a result of the labor, monetary, or in-kind contribution of either spouse." R.C. 3105.171(A)(4).
It follows that when either spouse makes a labor, monetary, or in-kind contribution that causes an increase in the value of separate property, the increase in the value is deemed marital. Middendorf v. Middendorf
(1998), 82 Ohio St.3d 397, 400. On the other hand, appreciation, as a result of an increase in the fair market value of separate property due to its location or inflation, is considered passive income. Munroe v.Munroe (1997), 119 Ohio App.3d 530, 536. Because Kenneth sought to have the appreciation of the Trevino and Ohio Pike properties characterized as separate property, he had the burden of proof on this issue by a preponderance of the evidence. Peck, 96 Ohio App.3d at 734.
The Ohio Pike property was purchased in 1990 for $100,000 and sold sometime between August 1998 and January 1999. There is absolutely no evidence in the record as to the sale price of the property. As a result, there is no evidence as to the alleged passive appreciation of the property, and Kenneth has failed to meet his burden of proof.
With regard to the Trevino property, the record shows that it was purchased in 1991 for $230,000. By magistrate's decision filed March 6, 2000 and adopted by the trial court, the trial court found the property had a value of $275,000. While there was an increase of $45,000 in the value of the property (which was also the marital residence), the record does not contain evidence attributing the cause for this increase. There was no evidence that either party made any labor, monetary, or in-kind contribution. Likewise, Kenneth did not provide any evidence that the $45,000 increase was solely attributable to market conditions or the mere passage of time. Kenneth has therefore failed to meet his burden of proof.
Given the lack of evidence to trace the passive appreciation of the Trevino and Ohio Pike properties to him as separate property, we find that the trial court did not err by failing to award him "the passive appreciation of his non-marital gifts as separate property." See Maticv. Matic (July 27, 2001), Geauga App. No. 2000-G-2266, unreported. Kenneth's second assignment of error is overruled.
In his third assignment of error, Kenneth argues the trial court erred by ordering him to pay Carleen a lump sum of $15,000 for spousal support. Kenneth asserts that the trial court failed to indicate the basis for its spousal support order.
The trial court is given broad discretion in determining whether an award of spousal support is appropriate. Holcomb v. Holcomb (1989),44 Ohio St.3d 128, 130-131. A trial court's decision to award spousal support will be reversed only if found to be an abuse of that discretion. Blakemore v. Blakemore (1993), 5 Ohio St.3d 217, 218-219. Likewise, the trial court is given wide latitude in determining the amount of spousal support to be awarded, as long as the trial court properly considers the statutory factors of R.C. 3105.18. Schneider v.Schneider (1996), 110 Ohio App.3d 487, 494. In setting forth its decision, the trial court must indicate its basis for the award in sufficient detail to enable the appellate court to properly review the award. Id.
We note at the outset that in challenging the spousal support award, Kenneth argues about the $120,000 Carleen received "as an advance on any potential awards by the Trial Court." The record clearly shows, and Kenneth's attorney so stated, that the money was "an advance on her property distribution" to allow her to find her own residence and vacate the marital residence. Both parties were cognizant that the $120,000 represented payment for property division only and in no way related to a potential award of spousal support. Indeed, the March 6, 2000 magistrate's decision as adopted by the trial court gives Kenneth "a credit in the amount of $120,000.00 in the property division" and ensures that he receive such credit from the proceeds of the sale of the real estate.
Kenneth also emphasizes the fact that Carleen received her IRA, a vehicle, a percentage of his 401(k) (the parties stipulated that seven percent of the 401[k] was marital), household furnishings, and that she is to receive "substantial cash distributions from the proceeds of Ohio Pike * * * and from future sales of Trevino and the Tennessee resort property." We note that Kenneth received his IRA, two vehicles, and household furnishings. We further note that in addition to a house his mother gave him (valued at $70,000) and the portions of the down payments found to be his separate property ($66,000), he, too, will receive substantial cash distributions from the sale proceeds of the three properties. See Johnson, Warren App. No. CA99-01-001, unreported (holding that separate property distributed under R.C. 3105.171 must be considered for purposes of spousal support).
The trial court based its spousal support award as follows:
 The parties were married for slightly more than sixteen years. Both parties enjoy good health. [Kenneth] is 56 years old and worked throughout the parties' marriage. [Kenneth] at times made a large salary. However [Kenneth] testified that his business income has declined in the past few years as he lost his major client. In his final written argument, [Kenneth] states that his gross income from his business was $13,500. [Kenneth] also received rental income from the Ohio Pike property in the amount of $18,000. [Kenneth] states that this income will obviously cease, as the property has been sold. However, [Kenneth's] rental income was received from his own company. Therefore, as the company's rental expense has been eliminated, [Kenneth's] income will accordingly rise. [Kenneth] therefore has a yearly income of approximately $31,500. The Court finds that [Kenneth] has excess income beyond his stated expenses.
 [Carleen] is 45 years old and worked only sporadically during the marriage. At one time she performed casual labor for [Kenneth's] company for a number of years. [Carleen] also has a managing beautician's license which she kept in good standing, although she has not worked as a cosmetologist. [Carleen] presently works * * * 24 hours per week [at $9.50/hour]. The Court finds no reason why [Carleen] could not be working full time. Imputing minimum wage to [Carleen] for sixteen hours per week, the Court finds that [Carleen] has an annual income of approximately $16,000. The Court finds that [Carleen] has expenses of approximately $2200 per month. As [Carleen's] expenses exceed her income, [Carleen] has a need for spousal support.
 Each party will be receiving significant cash assets from the sale of the parties' three properties. As well, each party will retain some retirement savings. However, [Carleen], during the marriage, was removed from the workforce for a significant period of time while [Kenneth] was able to establish a successful business. As a result, the Court finds that [Carleen] has a need for spousal support in order to re-establish herself in the workforce. In making the spousal support award, the Court has considered that [Carleen] is ten years younger than [Kenneth], will receive significant sums of cash from the real estate sales, and has little work experience.
 The Court finds that a lump sum is most appropriate in this case due to the often erratic nature of [Kenneth's] income, and the current liquidation of assets which will result in the availability of large amount of cash to the parties.
We find that the trial court's foregoing decision sets forth more than sufficient facts upon which to review the spousal support award and the amount of that award. The trial court's decision shows that the court properly considered the factors set forth in R.C. 3105.18(C)(1), and provided sufficient findings to support its ruling. We therefore find that the trial court did not abuse its discretion in awarding Carleen spousal support or in determining that the amount of spousal support to be awarded should be a lump sum of $15,000. Kenneth's third assignment of error is overruled.
In his fourth assignment of error, Kenneth argues the trial court erred by ordering him to pay Carleen $5,000 in attorney fees. Kenneth asserts he should not have been ordered to pay any fees at all since Carleen received $120,000 during the divorce proceedings. In her fifth cross-assignment of error, Carleen argues the trial court erred by awarding her only $5,000 of the $19,000 attorney fees she incurred.
It is well-established that an award of attorney fees is within the discretion of the trial court. Rand v. Rand (1985), 18 Ohio St.3d 356,359. The party seeking an award of attorney fees must demonstrate (1) some financial need for the award, and (2) that the demand for attorney fees is reasonable under the circumstances. Sargent v. Sargent (Dec. 19, 1988), Clermont App. Nos. CA88-01-002 and CA88-01-004, unreported, at 8. The trial court must further find that the other party has the ability to pay the attorney fees awarded by the court. R.C. 3105.18(H).
Once again, Kenneth argues about the $120,000 Carleen received during the divorce proceedings. We reiterate that the money was "an advance on her property distribution" to allow her to find her own residence and vacate the marital residence, and did not relate to a potential award of attorney fees. Again, the record shows that Kenneth was given credit in the overall property division for the $120,000 received by Carleen. The magistrate's March 6, 2000 decision ensures that Kenneth will be reimbursed for the $120,000 out of the proceeds from the sale of the real estate.
In awarding the attorney fees, the trial court stated that
 Based upon the totality of the evidence presented, the Court finds that [Carleen] has established a need for attorney fees. [Carleen] has incurred attorney fees of approximately $19,000 in this matter. Specifically, the Court finds that requiring [Carleen] to pay her own attorney fees would cause a depletion of [her] assets. The Court finds that [Carleen] has established the reasonableness of the attorney's fees incurred on her behalf in this matter. Further, the Court finds that [Kenneth] has the ability to pay a portion of [Carleen's] fees.
Upon reviewing the record and the property division in its entirety, we cannot say that the trial court abused its discretion in awarding $5,000 in attorney fees to Carleen. Each party should bear primary responsibility for their own attorney fees, particularly when the party requesting the fees has some ability to pay. See Gourash v. Gourash
(Sept. 2, 1999), Cuyahoga App. Nos. 71882 and 73971, unreported. Carleen incurred $19,000 in attorney fees, and Kenneth was ordered to pay $5,000 of her attorney fees. Carleen therefore bears the majority of the fees. We find that the trial court did not err, to either side, in determining that attorney fees should be awarded and in what amount. Kenneth's fourth assignment of error and Carleen's fifth cross-assignment of error are therefore overruled.
In his fifth assignment of error, Kenneth argues that the trial court erred by "failing to reimburse [him] for monies expended post decree for maintaining the real estate pending sale." We disagree.
The April 13, 1999 divorce decree ordered that the Trevino and Tennessee properties be listed for sale. The decree further stated that "[p]ending the sale [of both properties], [Kenneth] shall be responsible for the mortgage, insurance and taxes." Upon the sale of the Trevino property, Kenneth is to receive $46,000 of the net proceeds as his separate property. The remaining net proceeds are to be divided equally between the parties. With regard to the Tennessee property, the net proceeds from the sale are to be divided equally between the parties.
It is well-established that a trial court has broad discretion to determine what division of assets and liabilities is equitable in a divorce proceeding. Kaechele v. Kaechele (1988), 35 Ohio St.3d 93, 95. In addition, a trial court has discretion to issue an order requiring the sale of any real property, with the proceeds from the sale to be applied as determined by the court. R.C. 3105.171(J)(2).
With the exception of the $46,000 of the Trevino property down payment which was awarded to Kenneth as his separate property, the Trevino and Tennessee properties were implicitly found to be marital assets by the trial court. It follows that the properties' mortgages, insurance, and taxes are marital liabilities, even though incurred post divorce decree, until such time the properties are sold. Looking at the property division in its entirety, we find no abuse of discretion in the trial court's decision ordering Kenneth to pay the properties' mortgage, insurance, and taxes pending the properties' sale. In addition, with regard to the Trevino property, it is undisputed that Kenneth resides there (and has been since the parties purchased it). The trial court's order is thus a quid pro quo for Kenneth's right of occupancy. See Lynnv. Lynn (Feb. 23, 1982), Fairfield App. No. 40-CA-81, unreported. We therefore hold that the trial court did not err by failing to reimburse Kenneth for monies he expended to maintain the Trevino and Tennessee properties pending their sale. Kenneth's fifth assignment of error is overruled.
In her second cross-assignment of error, Carleen argues that the trial court abused its discretion by failing to award her one-half of K. J. Golick Co.'s value, more specifically, by failing to award her one-half of K. J. Golick Co.'s $5,000 accounts receivable and one-half of a $18,520 loan from Kenneth to his company. We disagree.
The trial court found that K. J. Golick Co.'s fair market value upon liquidation was $10,000, and ordered Kenneth to pay Carleen $5,000, "her one half interest in the company[.]" Kenneth's exhibit 29, the company's valuation report, clearly shows that the $5,000 accounts receivable were included as assets in the evaluation of the company's fair market value. Being so included, Carleen necessarily received one-half of such accounts receivable when she was awarded one-half of the company's fair market value. Similarly, the exhibit clearly shows that Kenneth's $18,520 loan to the company was included as a liability in the evaluation of the company's fair market value. Being so included, the trial court necessarily considered the loan when it found the company's fair market value to be $10,000.
Carleen argues, however, that the loan is a marital asset. Unfortunately, there is no evidence in the record as to the source of monies used by Kenneth to loan money to his company. Nor has Carleen provided us with such evidence. In light of all of the foregoing, we therefore find that the trial court properly awarded Carleen one-half of the company's $10,000 fair market value. Carleen's second cross-assignment of error is overruled.
In her third cross-assignment of error, Carleen argues that the trial court abused its discretion by "failing to award her expenses incurred during the pendency of the divorce."
In 1998, Carleen incurred expenses of $525 for dental treatment, $74.15 for sewing machine repair, and $1,200 to repair damage to her vehicle caused by Kenneth. By magistrate's order filed August 31, 1998, Carleen was granted exclusive occupancy of the marital residence during the divorce proceedings, and Kenneth was ordered to vacate the residence. The order further stated that "[u]pon vacating the marital residence, [Kenneth] shall continue to pay all of the expenses set forth on his 509-2 affidavit, with the exception of groceries, and, in addition shall pay to [Carleen] the sum of $400.00 per month to pay for groceries and other incidental household expenses." Kenneth's objections to the magistrate's order were overruled by the trial court. The trial court's March 1999 decision on divorce and April 1999 divorce decree did not require Kenneth to pay for household expenses or to reimburse Carleen for the foregoing expenses.
Upon reviewing the record, we find that the trial court did not abuse its discretion "by failing to award her [the foregoing] expenses." The magistrate's order clearly conditioned Kenneth's obligation to pay household expenses upon his vacating the marital residence. Carleen's attorney admitted it during an August 26, 1998 hearing when he stated "`Upon vacating the marital residence, [Kenneth] shall continue to do all these other things.' I suppose those have not come into play due to [Kenneth's] failure to comply with the court order and vacate the residence. * * * His vacation of the residence, if he had followed the court order, would have triggered those financial obligations." The record shows that despite the magistrate's order, the parties continued to reside in the marital residence until Carleen moved out of the residence in January 1999. Carleen's third cross-assignment of error is therefore overruled.
In her fourth cross-assignment of error, Carleen argues that the trial court erred "in failing to permit [her] to introduce evidence of [Kenneth's] past loans from his family, in failing to admit evidence of [Kenneth's] verbal statements relating to the sources of funds used for down payments, and in admitting heresay [sic]."
We first address Carleen's argument that the trial court erred by excluding relevant evidence. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The admission of evidence under Evid.R. 401 is a matter within the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, 180. A trial court's decision to exclude evidence under Evid.R. 401 will not be disturbed on appeal absent an abuse of discretion. State v. Blankenship
(1995), 102 Ohio App.3d 534, 549.
During Kenneth's cross-examination, his attorney objected to Carleen's attorney's attempt to introduce her exhibits 14A, 16, 17, and 18. Exhibit 14A is a copy of two handwritten notes from Kenneth's aunt loaning money to Kenneth and Rose Golick (his first wife). One note is dated 1966, the other 1971. The other three exhibits are court documents from Cuyahoga County involving Kenneth's divorce from his first wife, as follows: (1) exhibit 16 is a 1982 referee's report finding that alleged loans extended to Kenneth as part of a down payment for the marital residence were gifts to Kenneth and Rose; (2) exhibit 17 is a 1984 referee's report modifying Kenneth's child support obligation regarding his children from his first marriage; and (3) exhibit 18 is a 1982 court of common pleas' entry granting a divorce to Kenneth and his first wife. The trial court sustained the objection and excluded the exhibits on the grounds that they were neither relevant to the divorce proceedings between Kenneth and Carleen, nor relevant to the parties' three properties. The exhibits were later proffered.
During Carleen's direct examination on rebuttal, Kenneth's attorney also objected to Carleen's testimony regarding comments made by Kenneth to the effect that the parties' neighbors "didn't earn the money to buy [their] house, as we did; it was given to them, it wasn't earned by them[.]" The trial court sustained the objection and excluded Kenneth's comments from the evidence. The comments were later proffered.
On appeal, Carleen argues that had the exhibits and comments been admitted into evidence, they would have established a twenty-year pattern of Kenneth borrowing funds from his aunt and mother dating back to his first marriage. Carleen asserts that the exhibits and comments were probative as to whether the monies received during the parties' marriage from Kenneth's mother and aunt were gifts or loans.
Upon reviewing the record, we find that the trial court properly excluded the exhibits and comments from the evidence. We fail to see how the exhibits or the comments are even remotely relevant to whether the monies received during the parties' marriage from Kenneth's mother and aunt were gifts or loans. Certainly, the fact that his aunt and mother loaned him money during his first marriage (and possibly at the beginning of his second marriage) does not necessarily mean that monies received and used to purchase the parties' three properties were loans as well. Indeed, while Kenneth denied borrowing money from his mother and aunt during the parties' marriage, he admitted borrowing money from them during his first marriage. Kenneth testified that some loans were forgiven while others were paid back. Kenneth also testified that while he had paid back loans from his father, "when he died, it just changed." With regard to the comments, the record shows that Kenneth was asked about them on cross-examination. Kenneth testified, however, that he did not remember making such comments. In light of the foregoing, we find that the trial court's decision to exclude the exhibits and comments was not an abuse of discretion.
We next address Carleen's argument that the trial court improperly admitted hearsay. Carleen's argument refers to Kenneth's exhibit 17, a compilation of accounts from Ohio Savings Bank. The exhibit lists several accounts and the names of their owners, as well as the dates and amounts of withdrawals from three specific accounts (an account held by Kenneth's mother, one held jointly by his mother and him, and one held by his aunt). Carleen's attorney objected to the admission of the exhibit on the ground that it was hearsay. Kenneth's attorney replied that
 Well, your Honor, I believe both of the parties testified extensively from this exhibit. And, frankly, all of these exhibits could be hearsay if you really pressed on it. But this is a summary of the Ohio Savings received from the bank. * * * I'm sure we could get something from Ohio Savings Bank. All the bank statements are hearsay if we look at it that way.
 The trial court admitted the exhibit on the ground that "[t]here certainly was a lot of testimony. And in the strict sense, they're hearsay. I think both sides seem to be almost dependent on that both ways."
On appeal, Carleen argues that "without this exhibit, [Kenneth] lacked sufficient, substantive and credible proof to establish by clear and convincing evidence his claim that the funds were traceable gifts and, therefore, separate property."
Hearsay evidence is an out-of-court statement made by someone other than the declarant offered to prove the truth of the matter asserted. Evid.R. 801. The decision whether to admit evidence rests within the sound discretion of the trial court. Brashear v. Brashear (Apr. 8, 1991), Butler App. No. CA90-08-166, unreported, at 7. In determining whether the trial court abused its discretion, our analysis focuses not merely upon whether the court committed an error of law or judgment, but rather whether the trial court's attitude was unreasonable, arbitrary or unconscionable. Id. at 7-8.
We agree with Carleen that Kenneth's exhibit 17 is hearsay. Moreover, since Kenneth failed to comply with the business records exception to the hearsay rule set forth in Evid.R. 803(6), the exhibit does not fall under an exception to the hearsay rule. Id. at 7.[3] We find, however, that the admission of the exhibit was not an abuse of discretion. Unlike other exhibits, this exhibit was not objected to when it was first introduced. Rather, its admission was objected to after the divorce case had been fully litigated. The record shows that the exhibit was relied upon by both parties during Kenneth's direct and cross-examinations. Contrary to Carleen's assertion, the exhibit was not solely relied upon by Kenneth to claim that the majority of the monies used for the down payments were his separate property. Rather, the exhibit was relied upon to trace one sixth of the Trevino property down payment and one fifth of the Ohio Pike property down payment. Independently of the exhibit, Kenneth testified about some of the monies highlighted in the exhibit. Under those circumstances, we cannot say that the admission of the exhibit was so unreasonable, arbitrary or unconscionable as to connote an abuse of discretion. Carleen's fourth cross-assignment of error is overruled.
Judgment affirmed.
YOUNG, P.J., and POWELL, J., concur.
[1] We note that the brief filed on behalf of Carleen violates App.R. 19(A) which requires "double spacing between each line of text except quoted matter[.]" The brief is instead "one and a half-spaced." This not only violates the rule, it makes it more difficult to read and "diminishes the persuasive value of the finished product." Barnett v.Carr (Sept. 17, 2001), Butler App. No. CA00-11-219, unreported, at 2, fn. 1, quoting Gillum v. Malishenko (Aug. 2, 1995), Greene App. No. 95 CA 1, unreported.
[2] The two appeals were sua sponte consolidated by this court by entry filed May 27, 1999.
[3] Interestingly, we note that many exhibits from Kenneth and Carleen were hearsay as well and did not fall under the business records exception pursuant to Evid.R. 803(6). Yet, they were relied upon by both parties and not objected to.